(R.D. 11185)

HOYT, SHEPSTON & SCIARONI *v.* UNITED STATES

Entry No. 38676, etc.

(Decided June 8, 1966)

*Dinkelspiel & Dinkelspiel* (*John Poppin* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Glenn E. Harris* and *Avram Weisberger*, trial attorneys), for the defendant.

WILSON, Senior Judge: These 12 appeals for reappraisement were consolidated for trial. They concern the value of numerous and varied pieces of used and/or antique household goods, furniture, and bric-a-brac. The merchandise was exported by K. A. Spearing of the Isle of Wight, England, who shipped it on *consignment*. Seven of such exportations were sent to Peninsula Auction Studio, Burlingame, Calif., three to Harold Reich, Lakeshore Auction Gallery, Oakland, Calif., and two to Romano Auction Gallery, Oakland, Calif. The merchandise was exported between November 20, 1959, and February 11, 1961. All entries were made at the port of San Francisco, Calif., by plaintiff, a customs brokerage firm.

Plaintiff made entry at the unit prices stated in the packing lists (considered as invoices) which prices are claimed to be the correct dutiable values on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

Appraisement was made at the said entered unit prices, plus 40 percent, on the basis of United States value, as defined in section 402(c) of said amended act.

In reappraisement proceedings, the statute, 28 U.S.C., section 2633, provides that the value found by the appraiser shall be presumed to be the value of the merchandise. The burden rests upon the party who challenges the correctness of appraisal to prove said valuation to be erroneous. He must also establish what he claims to be the proper basis for appraisal. This obligation does not shift unless and until the plaintiff has shown *prima facie* that such appraisement is erroneous and has *also* established a different value to be the proper basis for appraisal. Upon plaintiff's failure to present such proof the value fixed by the appraiser remains in full force and effect. *1. Arditi* v. *United States*, 50 CCPA 49, C.A.D. 818; *H. S. Dorf & Co., Inc., etc.* v. *United States*, 41 CCPA 183, C.A.D. 548; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502.

In the case at bar, it is plaintiff's burden to establish the statutory elements essential for the existence of export value. The provisions of the statute considered herein are as follows:

Section 402(b) of the Tariff Act of 1930, as amended, *supra*—

Sec. 402. Value.

\* \* \* \* \* \* \*

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

"\* \* \* freely sold or, in the absence of sales, offered for sale," as above provided for, is defined in subdivision (f) (1) of section 402, as amended, *supra*, as follows:

(f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions \* \* \*.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

Plaintiff contends that "the basis of appraisement at United States value is incorrect" and that it "has established all elements necessary to prove 'export value.' "

The Government contends that plaintiff has not presented evidence that tends to establish the statutory elements of export value and, therefore, did not meet its burden of proof.

The primary facts of record, briefly stated, indicate that exporter Spearing has been an antique dealer for about 9 years; that he purchases used and/or antique household articles from various auction houses, antique dealers, secondhand shops, and junk dealers in England. The involved merchandise was shipped on *consignment* to certain auction houses in the United States for sale at auction for the ex-

porter's account. Each auctioneer received as commission 25 percent of the gross amount realized upon the sale of the merchandise, as well as the charges incurred for brokers services, cost of transport or cartage to destination, and the customs duties. Each auctioneer remitted the proceeds of the sale, less commissions and the other charges.

Plaintiff's witnesses were George K. Brokaw, Ray M. Osborn, and William H. Ewen, respectively the collector, the appraiser, and an examiner at the port of San Francisco, and Harold Reich, owner of Lakeshore Auction Gallery, Oakland, Calif. Robert E. Mullins, a clerk for plaintiff, also testified. Plaintiff also offered seven documentary exhibits. The oral and documentary evidence will be referred to, *infra*, as deemed necessary. The evidence presented, much of which was irrelevant, contains no proof inconsistent with the brief résumé of the facts given in the next preceding paragraph or which controverts any other statements hereinbefore set forth.

Mr. Brokaw, under subpoena, produced 16 official files of entries, exhibit 1, covering exportations on *consignment* by Spearing to plaintiff for the account of Peninsula Auction Studio and Lakeshore Auction Galleries between May 24, 1961, and September 20, 1963. Each of these files contains an affidavit relating to the particular merchandise in each particular entry and shows "cost" as well as "value" at which the merchandise is allegedly freely offered for sale. While the said 16 files were received in evidence, they relate to exportations too remote to have probative value in establishing any basis for valuation of the merchandise in the 12 appeals before the court. There is no relationship between the earlier and later shipments and the items of merchandise are different as are prices. Moreover, how the appraiser treated the later shipments cannot form a basis for contention that the appraiser's action in the earlier cases was erroneous. It must be noted that these transactions were subsequent to the importations at bar and shed no light on the "conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement."

Mr. Reich testified that he did business with Spearing for about 3 years and received goods on consignment for sale at auction on a commission basis; that, prior to arrival of shipments, he usually received a list from the exporter showing only the merchandise, and *not* the prices or values, exhibit 2. After the merchandise arrived, he usually received a similar list showing the merchandise and also prices which "represent the recommended selling prices," exhibit 3, which states "Selling Guide Prices." Reich was in England in 1947 or 1948 and on four occasions between 1957 and 1963. He purchased

used and antique household articles in London and Glasgow. In purchasing such merchandise, he testified that—

* * * one man may be able to buy cheaper than the next man, depending on the situation. I go over as an American, and I'm in a hurry to buy stock, and I would pay a great deal more than a man— than Mr. Spearing would over there. He has his home there. He takes his time. We work with other dealers. He can buy 50 percent cheaper than I could over there, than any other American could.

Reich also stated that the market changes continuously and that London is a market for merchandise more or less similar to that which he and Peninsula Auction Studio received.

Under cross-examination, Reich testified that he could not describe the first item on R62/15036 as the merchandise therein is not one of his shipments and that he did not see the merchandise; that he does not know where Spearing purchased the merchandise or the price he paid or Spearing's profit on the merchandise consigned to him or to the others. Obviously there is nothing in the Reich testimony upon which one could find a basis for export value. Counsel agreed that the merchandise in the 12 files under consideration herein consists of goods described as used household furniture, bric-a-brac, and in some cases antiques; that Reich is familiar with the same generic type of antiques and used household furniture. However, defendant's counsel did not concede "that any of it is similar to any other for appraisement purposes." Government counsel conceded that the witness knows the prices both in the United States and in England "as a broad range of goods, yes," but further stated "I do not concede it as to any particular item involved * * * here."

Plaintiff's exhibit 4 is a letter from Spearing to Reich dated February 20, 1961, which plaintiff's counsel alleges contains an offer to sell the goods involved in one of these specific shipments to Reich. An examination of this exhibit 4 indicates that it may have reference to the merchandise in R62/15080. This, the court infers, because the letter and the file in said appeal both refer to the amount of $867.50 and to the steamship "Loch Avon." Said exhibit states in part as follows:

* * * The prices we give are fair and represent cost plus an increase and so MUST be ABOVE the market values inasmuch as an American buying the same goods at the same price could have them invoiced at that cost price and pay duty on that. We have also asked Hoyt to ask the Customs Apraiser [sic] if you bought the goods for your own account as a purchase if he would assess duty on this bases [sic] instead of the same basis plus 100 which they are doing in the case of this non-purchase position as at present.

*       *       *       *       *       *       *

* * * Assuming that they would accept the fact of the goods being sold * * *.

The court does not consider the foregoing, or anything else stated in exhibit 4, to be a *bona fide* offer, or that it affects the presumptively correct appraised value.

Plaintiff's counsel offered six letters dated between December 19, 1960, and July 17, 1961, solely for the purpose of showing the general method of doing business between Reich and Spearing on consignment shipments. These letters were received as plaintiff's collective exhibit 5. It is not disputed that Reich, or the other receivers of Spearing's merchandise in the cases at bar, actually did business with him on a consignment basis. After reading these letters at the time of trial and again in preparation of this decision, the court adheres to its statement to importer's counsel during the trial, that said correspondence does "not assist you in discharging the burden of proof of what constitutes the export value of the merchandise in question, if it had such value," and "I think they are irrelevant and immaterial."

Counsel agreed that, if Mr. Reich were asked questions relating to purchase price to him of each of the items of merchandise in the shipments before the court (Reich did not actually purchase any of the merchandise), he would testify that he would have been able to purchase such goods in England, or goods of a similar nature for the prices set forth as to each item in the packing lists in all appeals, and that "it might cost him a little bit more in some cases, or a little less in other cases, depending from whom he was buying, et cetera, which he would explain in every situation, but that the prices set forth on the packing lists are substantially what it would cost; it would have cost Mr. Reich for these goods in England." Government counsel added that it be understood that his standing objection to this witness testifying on merchandise which was *not consigned* to him would also prevail to this testimony.

I find that the foregoing stipulation is without probative value in establishing an export value for the merchandise. None of the essential elements of said basis of valuation is shown. The prices listed are vague, indefinite and uncertain, and cannot represent prices freely offered for sale to *all* purchasers. Plaintiff's counsel, in their brief, argue that the foregoing stipulation, entered into to avoid Reich testifying to each item and "giving his estimation or opinion as to the market value of the item," coupled with the facts in Spearing's affidavit, exhibit 7, "show[s] all elements necessary to prove 'export value.'" This argument is not supported by the record. Exhibit 7, Spearing's affidavit, states the alleged total "cost" and total "price" at which he "freely offer[s] the goods to all purchasers in the ordinary course of trade" in respect to shipments, including those before the court. In view of Spearing's invoice statements in the cases at bar and the testimony of Reich, that the merchandise was sent on consign-

ment, and that the prices or values stated therein represent only recommended selling prices, they cannot at the same time be "freely offered for sale" prices. The fact is, that the exporter did *not* freely offer his merchandise to the auction houses at the prices stated in the invoices.

Exhibit 6 also gives the same alleged "cost" and "price" totals as exhibit 7 and states it is Spearing's usual practice on consigned goods to auctioneers, to send, following exportation, "suggested auction prices for the particular articles" and that he does not generally "reveal to the auctioneer my cost price or the invoiced price." He also alleges that the sellers in England knew the nature of his business and knew or should have known that he was shipping the merchandise to the United States for auction. Such evidence does not establish a freely offered for sale price for export to the United States. Plaintiff's counsel admitted that Spearing did not offer the goods in these shipments to each of the consignees (R. 53).

Mr. Mullins, a clerk for plaintiff, testified he prepared the list of shipments in collective exhibit 1. He alleges he had several conversations with Mr. Ewen prior to receipt of exhibit 7, dated March 14, 1962. On those occasions, he was told there would be an advance in value of 100 percent and then of 50 and 40 percent. He said Ewen did not explain the intended increase, and Mullins did not ask for such information. Mullins stated that Spearing requested that he not reveal invoice or alleged cost prices to ultimate consignees. Spearing said he would subsequently send higher prices to the auctioneers which were not list prices but suggested auction prices.

Mr. Osborn testified he had been the appraiser at San Francisco since July 1956; that he made the appraisement in all 12 cases and in all but two of the entries in collective exhibit 1. Counsel stipulated that the appraiser adopted the examiner's recommended findings in exhibit 1.

Mr. Ewen testified that he was a clerk in the Bureau of Customs, then an examiner's aide for about 5 years and for about 10 years a line examiner at San Francisco. He has handled this type of merchandise for 8 to 10 years and attends auction previews. He does not attend auction sales. He stated that no other shipper to the United States sends merchandise on the *consignment* basis and that Spearing is unique in that area. He examined all the merchandise in all cases before the court and five of the entries out of collective exhibit 1. He established United States value as the basis for appraisal in the cases at bar at an increase in value of 40 percent, but not on those in exhibit 1 as to which Spearing submitted an affidavit in each case. Of these he examined in exhibit 1, the merchandise was inferior to the quality of that before the court. The values given by Spearing in the items

involved in exhibit 1 seemed in accord with the regular market values and were accepted. Ewen stated that the true values were not reflected in the earlier entries, and he considered the merchandise had a greater value than stated in the invoices. Hence, he did not accept those prices as they did not appear in line with comparable merchandise available "here" imported by others, with which he compared Spearing's merchandise. His advance was made because Spearing's values were under the normal market for goods or merchandise of that type and he advanced the value on Spearing's merchandise to equalize it with merchandise imported by others. Ewen attempted to find an export value but could not as the export basis requirements were not there; he could not find a freely offered basis for accepting an export value. There was no comparable merchandise from Wooton, Isle of Wight, England, from whence the imported merchandise came. He stated that the price paid by Spearing would not influence him in finding a statutory value. Ewen stated that, if a principal market had been established and the merchandise was freely available for sale, he would have accepted export value, but not necessarily Spearing's prices. The plaintiff is bound by this testimony given by his own witness.

The evidence of record, substantially reviewed, *supra*, does not disclose the essential elements of proof necessary to establish export value as the correct basis for appraisement for the numerous articles involved in these 12 appeals for reappraisement.

The merchandise was shipped on *consignment* and, as admitted by plaintiff's counsel, was not freely offered for sale or sold at the time of exportation to any of the auction houses in the United States. There is no substantial indication, supported by proof, that the involved or similar merchandise was offered for sale or sold by Spearing at the time of the current exportations to all purchasers in the ordinary course of trade. In fact, Ewen states that *only* Spearing sent goods on *consignment* and that such practice by him was "unique." Reich testified that one person may purchase this type of goods cheaper than another and that Spearing can buy at 50 percent cheaper than he or any other American could. Counsel stipulated that Reich would testify that it might cost him a little bit more in some cases, and a little less in other cases. Thus, there would not be a single uniform price for any of such articles.

In *M. V. Jenkins et al.* v. *United States*, 34 CCPA 33, C.A.D. 341, the court stated that its decision in *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129, is *not* authority for holding that, where prices differ and there was no uniform price, the highest price shall be the price at which the merchandise is freely offered for sale within the purview of the foreign value statute, section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938

(T.D. 49646). The court stated it had no intention of so holding and, therefore, held that the dutiable values were the list prices at which the merchandise was freely offered for sale.

Spearing, in exhibit 6, alleges that he acquired the merchandise in these cases from various auction houses, *antique dealers*, secondhand shops, and junk dealers in England. As he himself is an antique dealer, there is no adequate showing that his personal method of sending goods to the United States on *consignment* is "in the ordinary course of trade" and consistent with the practices in England, at the time of exportation, by the other antique dealers. The requirement of the statute under consideration is not met where appellant fails to show the ordinary course of trade of the other antique dealers as provided for in section 402(f)(2), *supra*.

The court in *R. J. Saunders & Co. Inc.* v. *United States*, 55 Cust. Ct. 666, Reap. Dec. 11099 (decided November 8, 1965, and not appealed), stated that—

* * * It has likewise not been established that other dealers or manufacturers of similar merchandise did not freely offer or sell their product for exportation to the United States. * * *

The foregoing law is applicable to the situation in the instant case. Note also *Hudson Shipping Co., Inc.* v. *United States*, 43 CCPA 19, C.A.D. 604.

In a case involving importations of secondhand articles of the variety commonly called bric-a-brac, composed of brass, porcelain, glass, wood, marble, etc., and consisting of such items as chandeliers, statues, sconces, candelabras, plaques, frames, inkstands, and the like, the court, in *Renee Antiques, Inc., et al* v. *United States*, 56 Cust. Ct. —, Reap. Dec. 11151 (decided March 2, 1966), stated: "It was incumbent upon plaintiffs to show not the manner in which they bought, but the manner in which such or similar merchandise was sold or offered for sale to all purchasers. As to this proof which the statute requires for a showing of export value [same amended statute as here involved], the record is silent." In the case at bar, it was not incumbent upon plaintiff to show the manner in which they obtained the merchandise (on consignment) but the manner in which such or similar merchandise was sold or offered for sale to all purchasers, or the manner in which such or similar merchandise was shipped on consignment by other antique dealers in England for exportation to the United States, at the time of exportation.

On the record, plaintiff failed to make out a *prima facie* case. The record does not contain evidence sufficient to establish the claimed export value for the imported merchandise or evidence to overcome the presumptively correct United States value found by the appraiser.

I find the following facts upon the record presented:

1. That the merchandise consists of used and/or antique household goods, furniture, and bric-a-brac, exported from the Isle of Wight, England, between November 20, 1959, and February 11, 1961.

2. That said merchandise was shipped on *consignment* basis to three auction houses in the United States, for sale by them at auction.

3. That the auction houses were to retain 25 percent of the gross selling price realized at the auction sales, together with expenses and customs fees which they advanced.

4. That said merchandise was entered at the unit prices stated in the packing lists in each case (considered as invoices), which enumerated the individual items claimed as the export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

5. That said merchandise was appraised on the basis of United States value, as defined in section 402(c) of said amended act, at the unit prices stated in said packing lists (considered as invoices), plus 40 percent, packed.

6. That the prices stated in the said packing lists (considered as invoices) were not the prices at which such or similar merchandise was freely offered for sale or sold to all purchasers at wholesale in the ordinary course of trade.

I find as conclusions of law upon the record presented:

1. That the plaintiff has failed to make out a *prima facie* case on the basis of its claimed export value.

2. That the presumptively correct appraised values on the basis of United States value have not been overcome.

3. That United States value, as defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper basis for the determination of the value of the merchandise here involved.

4. That such United States value is represented by the appraised value as to all of the merchandise in each of the 12 appeals for reappraisement herein under consideration.

Judgment will be entered accordingly.